DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Scioto County Common Pleas Court, Juvenile Division, awarding appellee Scioto County Children Services ("SCCS") permanent custody of Kathy Harmon, born August 24, 1984, and Patricia Harmon, born October 24, 1988.
Appellant, Homer Harmon, the natural father of the children, assigns the following errors:
FIRST ASSIGNMENT OF ERROR:
 "THE DECISION OF THE TRIAL COURT GRANTING PERMANENT CUSTODY TO CSB DENIED HOMER HARMON HIS RIGHT TO DUE PROCESS OF LAW PURSUANT TO BOTH THE OHIO AND THE UNITED STATES CONSTITUTION."
SECOND ASSIGNMENT OF ERROR:
 "THE DECISION OF THE TRIAL COURT FILED SEPTEMBER 8, 1999, STYLED `FINDING OF THE COURT AND ENTRY' IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTAINS NUMEROUS FACTUAL ERRORS."
THIRD ASSIGNMENT OF ERROR:
 "THE CASE PLAN IS AGAINST PUBLIC POLICY, NOT SUPPORTED, BY AUTHORITY, WARRANTED BY SOUND REASON, OR IN THE INTERESTS OF JUSTICE AND SHOULD NOT BE A BASIS FOR TERMINATION OF APPELLANT'S PARENTAL RIGHTS."
FOURTH ASSIGNMENT OF ERROR:
 "THE DECISION OF THE TRIAL COURT WAS CONTRARY TO 42 U.S.C. SECTION 12101 ET SE[Q]., `THE AMERICANS WITH DISABILITY ACT,' IN THAT CSB DID NOT OFFER A REASONABLE ACCOMMODATION TO HOMER HARMON['S] DISABLING CONDITIONS."
FIFTH ASSIGNMENT OF ERROR:
 "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FAILING TO APPOINT A PSYCHIATRIC EXPERT TO ASSIST IN THE CASE."
SIXTH ASSIGNMENT OF ERROR:
 "THE TRIAL COURT COMMITTED AN ERROR IN REFUSING TO HAVE A HEARING ON THE MOTION FOR SANCTIONS."
Our review of the record reveals the following facts pertinent to the instant appeal. The Harmon family, including (1) appellant, (2) his wife, Sharon, (3) appellant and Sharon's three children, and (4) appellant's children from a previous marriage, has a long history of involvement with numerous children services agencies. The case at bar originated in Allen County, Ohio.
On September 9, 1994, Allen County Children Services ("ACCS") filed a complaint in the Allen County Common Pleas Court, Juvenile Division, alleging Kathy, David, and Patricia Harmon to be dependent children and seeking temporary custody. The complaint alleged that the children: (1) were afraid of their father and feared physical abuse; and (2) lived in a filthy, unsanitary, and unsafe home.
On September 9, 1994, the trial court issued an emergency removal and shelter care order. In its decision, the trial court noted that the Harmon family, for several years, has received various services, including: (1) individual and family counseling; (2) referral for parenting classes; (3) family aide services; (4) extensive case management; and (5) alternative placement.
On December 5, 1994, the trial court, noting that the parents acknowledged the allegations of the complaint to be true, found the children dependent and ordered the matter scheduled for a dispositional hearing.
On January 11, 1995, the trial court, noting that the parents acknowledged that the children's best interests would be served by granting ACCS temporary custody, granted ACCS temporary custody of the children. The trial court also adopted ACCS's case plan. The case plan required the Harmons to address and resolve the following issues: (1) the parents' alleged use of excessive physical discipline with the children; (2) the filthy, cluttered, and roach infested condition of the home and the often filthy condition of the children; and (3) the children's allegations that certain relatives have committed sexual abuse against the children. The case plan requested the parents to: (1) discontinue physical discipline methods; (2) provide a safe and clean home; and (3) supervise the children more closely to prevent further sexual abuse.
On March 29, 1995, ACCS filed a case plan review. The review noted that the parents had moved from Allen County to Lucasville, Ohio in Scioto County.[1] ACCS also noted that the parents had not exercised frequent visitation with the children.
On July 17, 1995, ACCS filed a motion: (1) to modify the temporary custody to protective supervision; and (2) to transfer the case to Scioto County. On August 30, 1995, the trial court granted the motion and transferred the case. On September 21, 1995, the Scioto County Common Pleas Court, Juvenile Division, accepted the transfer.
On October 26, 1995, SCCS filed a motion requesting the court to terminate the protective custody order and to return the children to temporary custody. SCCS attached to the motion an investigator's affidavit. In her affidavit, the investigator stated that she visited with the children and that she also visited the home. The investigator averred that the children informed the investigator that the children had witnessed domestic violence between their parents and that a person alleged to have committed acts of sexual abuse against the children was residing on the same property as the children. The investigator additionally related that the home was extremely dirty:
 "Roaches were on the refrigerator and were observed elsewhere in the kitchen. The living room and kitchen were cluttered with boxes filled with clothing and other items. David's room contained boxes of clothing and toys. Papers were scattered on the floor. There were no sheets, and the mattress was dirty. Patricia and Kathy's room also had boxes of clothing and toys, and clothes were piled on the bed. Clothes were also piled on the bathroom floor."
On October 26, 1995, the court issued an ex parte protective order granting temporary custody to ACCS. On November 21, 1995, the court transferred custody of the children from ACCS to SCCS. On January 19, 1996, the court found the allegations of the October 26, 1995 complaint to be true and granted SCCS temporary custody.
On March 18, 1996, the court issued an order providing that, "[b]y agreement of the parties," temporary custody of the children would remain with SCCS. The court directed SCCS to submit a case plan with the goal of reunification. The court also referred appellant to the domestic violence program at Shawnee Mental Health Center ("SMHC").
On May 29, 1996, the trial court adopted SCCS's case plan. The case plan's stated goal was to reunite the children with the parents. The case plan required: (1) Sharon to establish a residence separate from appellant; (2) appellant to undergo intensive treatment that addresses issues of sexual and physical abuse; (3) Sharon to attend self-esteem and self-confidence counseling and to participate in classes designed to improve parenting skills; and (4) appellant and Sharon to attend home management environmental skills classes to learn how to remedy the unsanitary living conditions. The trial court imposed the additional condition that SCCS coordinate the scheduling of assessments and counseling for appellant and, if necessary, help arrange for his transportation.
On October 9, 1996, SCCS filed a motion for the permanent custody of Kathy, Patricia, and David.[2] In its motion, SCCS asserted that the parents are unwilling or unable to provide for the children's needs and that the parents have failed to remedy the conditions that led to the children's removal. Claiming that the children have significantly progressed during their stays in foster care, SCCS also asserted that permanent custody would serve the children's best interests.
On November 8, 1996, appellant filed a motion requesting the trial court to find SCCS in contempt for failing to implement the case plan. Appellant argued that SCCS: (1) failed to arrange for appellant to attend sexual offender counseling; (2) refused to help appellant obtain transportation in order to attend the domestic violence counseling program; and (3) refused to continue to pay rent for Sharon's separate residence, and thus failed to help Sharon establish a separate residence from appellant.
On September 12, 1997, appellant filed a motion for a home study. Appellant noted that he and Sharon had moved to a new residence and claimed that it would be an appropriate residence for the three children. Also on September 12, 1997, appellant filed a motion requesting that the children be placed in the custody of an aunt and uncle who reside in Kentucky. Subsequently, an interstate study was performed and the request for relative placement was denied.
During the course of the proceedings, the guardian ad litem
filed written recommendations. The guardian ad litem consistently recommended that SCCS be granted permanent custody of the children. The guardian ad litem noted that the children have adapted well to foster care and have demonstrated improvement in educational related activities. The guardian ad litem further related his belief that the parents remain unable or unwilling to provide a suitable home for the children that the parents have taken no substantial steps to comply with the case plan.
The trial court held five separate hearings, with the first hearing held June 6, 1997 and the last hearing held February 5, 1999, regarding SCCS's permanent custody motion and appellant's contempt motion. The testimony and evidence adduced at the hearings reveal, inter alia, the information set forth below.
Both the parents and the children have low IQs. Homer's IQ is 84, placing him in the low-end of the distribution of IQs. Sharon's IQ is 65, placing her in the mildly retarded range. Kathy's IQ is "borderline," at 76. Patricia's IQ is 85, placing her in the low range.
Appellant possesses a violent personality and the children have alleged that appellant uses excessive physical discipline. At various times, the children have stated that they are afraid of appellant (their father). Kathy stated that she has witnessed appellant beating her mother. Appellant has admitted to beating Sharon when the two first were married, but denies that he has committed any acts of domestic violence in recent years.
Richard D. Nickison, one of the Harmon family's caseworkers, stated that the children advised him that Sharon had never hit the children, but that Sharon would make the children pretend to be "getting a beating" to appease appellant. Nickison explained:
 "The children said that Sharon would take them into the back bedroom and they were supposed to yell and scream while she was hitting the bed or something so that Homer would feel that the kids were really getting a good beating and then they'd be coming out and they would be rubbing their behinds and crying like they were crying to satisfy Homer."
The children have also alleged that various relatives have sexually abused them. Kathy stated that her half-brother, Travis, had sexually abused her and that her brother, David, had attempted to have sex with her.[3] Kathy also alleged that she had witnessed her half-brother and his girlfriend engaging in sexual intercourse. We note that a doctor's examination did not reveal any physical evidence of sexual abuse. At some point, however, David contracted gonorrhea of the mouth.
Appellant's daughter from a previous marriage had been removed from the home due to sexual abuse allegations. The daughter reported that appellant had sexually abused her. Appellant denied these allegations and denied any allegations that he has sexually abused Kathy, Patricia, or David.
Appellant voluntarily submitted to a polygraph examination concerning the sexual abuse allegations. The polygraph examination revealed that appellant's denial was untruthful.[4]
Appellant, however, continues to deny the allegations.
Dr. Donna Hobbs evaluated appellant to determine whether sexual offenders counseling, as provided for in the case plan, would be available to appellant. Dr. Hobbs stated that appellant denied the sexual abuse allegations, but indicated his willingness to enter sexual offender counseling. Dr. Hobbs stated that sexual offender counseling may have helped appellant, even though he denied sexually abusing his children. Dr. Hobbs further stated that treating sexual offenders who are in denial often can be difficult.
As a result of Dr. Hobbs' report, SCCS decided not to pursue sexual offender counseling for appellant. Nickison stated that he did not arrange for appellant to attend sexual offender counseling because his interpretation of Dr. Hobbs' report led him to believe that the counseling would not benefit appellant.
Although SCCS acknowledged appellant's denials, the agency, throughout the proceedings, has maintained that the children would be at a high risk of sexual abuse if returned home. SCCS caseworker William A. Denton stated that appellant failed the polygraph and that SCCS will not allow the children to live near appellant.
When SCCS first became involved in the Harmons' lives, the Harmons were living in a house trailer. SCCS caseworkers visited the house trailer and noted that it was extremely dirty.[5]
Anita Hopper, a social worker at SMHC, stated that the house trailer was cluttered and had chicken feathers on the floor. She further stated that the home had numerous flies and that what appeared to be a slop bucket with a bad odor sat next to table.
After SCCS gained temporary custody of the children, the agency helped Sharon establish a new residence separate from appellant. Nickison stated that he approved of a home in Rubyville and that the agency agreed to pay two months of the rent. During the two month period the agency expected Sharon to take advantage of job training and educational programs and to become self-sufficient. Nickison stated that Sharon did not appear willing to undergo job training or to improve her education.
Nickison also encouraged Sharon to seek housing through the Portsmouth Metropolitan Housing Authority ("PMHA"). Nickison stated that Sharon indicated to him that she was not willing to seek housing through PMHA.
Nickison stated that when Sharon initially moved into the Rubyville residence, the home was in a satisfactory condition and was clean. When Nickison visited the Rubyville home after Sharon had moved in, however, Nickison stated that the home was dirty and infested with roaches and other bugs.
Hopper stated that she helped Sharon clean the Rubyville home and that she would give Sharon instructions on what and how to clean. Hopper stated that when she went to the Rubyville home on her next visit, the home still was not cleaned.
SCCS home base aide Carol Sue Sessor testified that she helped Hopper clean the Rubyville home. Like Hopper, Sessor also stated that the home was filthy. Sessor stated that she saw chicken feathers in the refrigerator and that roaches were present in the home.
In contrast to the foregoing testimony, Lee Horn, the landlord of the Rubyville property, and Sharon testified that the house was clean and that it was not infested with roaches.
After the two-month period expired, SCCS stopped paying the rent. Appellant was soon evicted. SCCS caseworkers explained that for several reasons they discontinued paying the rent including: (1) fiscal concerns; (2) because Sharon had not demonstrated any improvement; and (3) because Sharon appeared not to be staying at the Rubyville residence, but rather appeared to be staying with Homer.
Nickison stated that upon leaving the Rubyville home in August of 1996, Sharon returned to live with appellant in a home that was located on the same property as the house trailer where the Harmons had lived when SCCS initially became involved in the case ("the Sedan-Crabtree home"). Nickison stated that he believed the home was unfit for human habitation.
Nickison visited the Harmons in mid-October of 1996 and saw no improvements in the condition of home. Nickison explained his assessment of the Harmons as follows:
 "[M]y assessment of [the Harmons] is that the Harmons will be the same, they may at times improve in any one area, but the improvement is short-lived. None of the rhetoric they give a person can be believed because all they are doing is making an attempt to make themselves look better than they really are. The home they are living in is not[,] according to today's standards, inhabitable. Animals and beasts of burden would find the shelter more appropriate but certainly not humans."
Sessor stated that she visited the home and found the home "beyond hope."
In June of 1997, appellant and Sharon obtained housing through PMHA and moved into Farley Square. SCCS caseworker Denton stated that the Farley Square home is better than the Sedan-Crabtree home. Denton stated that the Harmons' current residence has two bedrooms, is somewhat cluttered and dirty, and has mattresses and blankets but no sheets.
Denton explained that if the children are returned home, the Harmons would qualify for a three or four bedroom residence. Denton stated that he believed the Farley Square residence, provided through PMHA, could be a suitable physical placement for the children.
Appellant and Sharon completed a one-on-one parenting course, as the case plan required. Katherine Adams Lewis,[6] SMHC Community Resource Supervisor, testified that she worked with appellant and Sharon in the parenting course. Lewis stated that despite being taught non-physical methods of discipline, appellant and Sharon held steadfast to their beliefs that physical discipline was the only form of discipline that could effectively control their children. Lewis explained that she attempted to teach appellant and Sharon non-physical methods of discipline, but they were not willing to stop hitting, spanking, and slapping.
Lewis explained that teaching appellant and Sharon was difficult. She stated that the parents appeared to have limited intellectual function, but that without specific psychological testing she could not determine if appellant and Sharon were unable or were unwilling to change. Lewis stated that after appellant and Sharon completed the parenting program, she did not feel that the Harmons had made any progress. Lewis wrote in a January 25, 1997 case note that she is "very worried for the safety of all of these children if they return home."
Like Lewis, Denton also stated that the parenting classes did not appear to help appellant or Sharon learn effective means of parenting the children. Denton explained that SCCS tried a home visit at the Farley Square residence and that it was so chaotic that he did not feel comfortable with further home visits.
SCCS caseworker Nickison explained that visits with Sharon at the Rubyville residence often were problematic. Nickison stated that prior to the first visit, the agency purchased new beds, mattresses, linens and covers for the children. The agency also provided cleaning and insect killing supplies.
Nickison stated that after the second visit at the Rubyville residence, Patricia became ill after eating spoiled food that her mother had provided to her. Nickison stated that Patricia explained the incident as follows: "[T]here was a bucket of beans on the back porch that her mother had thrown away and after she told her that she was hungry, she said her mother went out to the back porch and dipped some of the beans out of the bucket and warmed them up for her." Nickison also stated that Patricia and Kathy told him that their mother advised them not to brush their teeth because the roaches had been crawling on their toothbrushes.
Denton stated that appellant and Sharon do not control the children. Denton stated that appellant's and Sharon's "parenting skills * * * don't exist at that level." Denton stated that he does not believe further parenting courses would help, given the parents' limited IQs. Denton stated that he believes that the parents' poor parenting skills are a major obstacle to the children's return. Denton noted that Sharon completed the parenting classes twice and that she still does not have the parenting skills needed to care for the children.
Appellant stated that he believes that the domestic violence counseling and parenting courses have helped him. Appellant explained: "I've seen different ways of, what's it called, controlling the kids, or disciplining them; but, I still say sometimes if a kid, before I see one of my kids get hurt by things, I will spank them to keep from getting hurt."
A psychological evaluation of appellant reveals that appellant appears to have "an aggressive/sadistic approach to parenting" and that appellant does not seem "to have any motivation, desire, or commitment to want to learn new behaviors of parenting."
Kathy and Patricia have exhibited behavioral problems. Both children receive psychological counseling and both children have displayed sexual "acting out" behavior. Kathy reportedly molested a girl who was in foster care with her and has had other incidents of sexual "acting out" behavior. While in foster care in 1996, Patricia placed herself on the floor, began "gyrating," and stated that she was "humping." Patricia has also been observed masturbating and exhibiting sexual acting out behavior in the presence of a four year old child. In 1998, Patricia "was mixed up with another ten year old girl for respite and [the foster mother] caught them in their room with their pants down."
Both children have undergone counseling. Kathy shows signs of anxiety, depression, and an intense dislike of her father. Kathy takes Zoloft. At one point when she returned home to her parents, Kathy reported hearing voices. Patricia has been diagnosed with Attention Deficit Hyperactivity Disorder and takes ritalin.
Denton stated that Patricia has been at her current foster home for over one year and appears to be doing well and that she is the most stable of the Harmon children. Denton further stated that Patricia's foster parent has indicated that she would like to keep Patricia on long-term basis.
Patricia explained that she would like to go home and that her parents have never spanked or hurt her. Kathy stated that she would like to return home to be with her mother, but that she is afraid of her father's continued physical abuse. Kathy stated that her cousins and her half-brother sexually abuse her, but that her father does not. Kathy also stated that she believes her mother could handle parenting the children if appellant was not present in the home.
We note that throughout the course of the proceedings, both parents have continually and forcefully expressed the desire to have their children returned home.
Nickison stated that SCCS decided to file for permanent custody because the parents demonstrated no improvement in their ability to adequately parent the children and because Sharon refused to establish a separate residence to ensure the safety of her children. Nickison explained that Sharon needed to separate from appellant prior to having the children returned to her because the children had advised SCCS that they were afraid of their father and that they had witnessed domestic violence between the parents. Nickison further stated that the decision also was based upon the children's progress in foster care.
On September 8, 1999, the trial court granted SCCS permanent custody of Kathy and Patricia. The trial court found that the children cannot and should not be placed with their parents within a reasonable time and that granting permanent custody would serve the children's best interests. The court found that the parents are unable or unwilling to substantially remedy the conditions which led to the children's removal from the home. The court also found that the parents have not sufficiently improved their parenting skills, due in part to their inability to learn such skills. The court found that the parents' living conditions will not improve and that the threat of further physical and sexual abuse is substantial. The court also found that the testimony and evidence reveal that appellant possesses a violent personality. The court noted that allegations appear in the record that appellant has committed acts of domestic violence directed toward his wife and his children. The court also found that the children appear frightened of appellant's violent outbursts.
The court also noted that the sexual abuse allegations weighed in favor of granting SCCS permanent custody. Kathy had alleged that a relative had sexually abused her and that appellant admitted that two of his sons had engaged in some form of sexual contact, resulting in one son contracting gonorrhea of the mouth. The court further noted that appellant acknowledged that Kathy and Patricia have alleged that one of the sons sexually molested them.
The court acknowledged that appellant stated that he never sexually abused his children. The court found, however, that appellant voluntarily submitted to a polygraph examination and that the polygraph examination results indicate that appellant was not truthful when he denied the allegations.
The court noted that Sharon had attempted to establish a residence separate from appellant, but that she has continued to return to appellant. The court found that Sharon's unwillingness or inability to separate from appellant creates a substantial risk that the children will continue to suffer physical and sexual abuse that appellant presents.
At the time of the trial court's decision, the court noted the parents were living together and that they indicated a "fervent desire" to have the children returned to them. The court found, however, that the parents "have proven incapable of making the progress necessary for the children to be returned to them." Although the children express love for their parents, they also appear apprehensive of appellant and of the thought of returning to the home if appellant is present. The court found that the children need a secure and stable environment and that their parents are incapable of providing such an environment. Thus, the court determined that the children's best interest would be served by granting SCCS permanent custody.
On September 22, 1999, appellant filed a motion for a new trial. On December 21, 1999, the trial court denied appellant's motion for a new trial. The court reiterated its prior conclusion, stating:
 "[The children] are entitled to a permanent, secure, safe, non-abusive, clean, positive, nurturing family relationship. This can best be achieved by a grant of permanent custody and possible placement for adoption. These parents have not resolved any of the problems of abuse and living in filth which led to the removal of these children. Nor will they resolve those problems in the immediate or near future. To grant anything less than permanent custody is to deny these children their right to a permanent, safe, secure home, to which they are entitled."
The court rejected appellant's argument that the court's decision somehow violated the American with Disabilities Act ("ADA"). Assuming that the ADA applied, the court stated:
 "The testimony is replete with discussion of extraordinary efforts made to help this family: psychiatric/psychological evaluations and counseling, sexual offender counseling, domestic violence counseling, rent for the mother to obtain appropriate housing, availability of transportation, purchase of household goods and items for the mother, homemaker and housekeeper training and services (the Board even bought cleaning supplies and showed Ms. Harmon how to use them — to no avail.)
 Ms. Harmon moved into a clean, freshly painted home, with new, carpeting in Rubyville, and within two months it was filthy and infected with bugs and roaches. (Even one of the children became ill while visiting due to eating bad food.) The problem with this case is not that sufficient, extraordinary efforts were not made. The problem with this case is that extraordinary efforts were made, and that the Harmon's [sic] would not and/or could not for whatever reason improve the quality of their lifestyle to the point where these children could be returned to them to live a life free to [of?] abuse, violence, filth, roaches, lice and the like."
Although the trial court did not directly rule on the contempt motion, the court noted that appellant failed to show that SCCS failed to implement the case plan. The trial court found that the agency made extraordinary efforts to provide the services as provided in case plan.
On January 21, 2000, appellant filed his notice of appeal.
 I
Because appellant's first and fifth assignments of error both raise due process challenges, we will consider the assignments of error together.
In his first assignment of error, appellant argues that the trial court's decision granting SCCS permanent custody denied appellant due process of law. Appellant notes that SCCS originally was granted temporary custody of the children due to unsanitary living conditions and due to allegations of sexual abuse by appellant. Appellant contends that he and Sharon now live in a safe, secure, sanitary environment and that the allegations of sexual abuse are unfounded. Appellant argues that he had to "guess" what problems remain. Appellant appears to argue that SCCS failed to adequately advise appellant of the conditions that led to the children's removal. In his fifth assignment of error, appellant argues that the trial court violated his due process rights by failing to appoint a psychiatric expert.
A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child. Santosky v. Kramer
(1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; In reMurray (1990), 52 Ohio St.3d 155, 156, 556 N.E.2d 1169, 1171. Moreover, a parent has an "essential" and "basic civil right" right to raise his or her children. Murray.
The parent's rights, however, are not absolute. Rather, `"it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed."' In re Cunningham
(1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (quoting In reR.J.C. (Fla.App. 1974), 300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands such termination.
In Santosky, the United States Supreme Court recognized that a natural parent retains his or her fundamental liberty interest throughout permanent custody proceedings and must be provided with fundamentally fair procedures throughout such proceedings.
The court stated:
 "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."
Id. at 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599.
To ensure that a parent is afforded fundamentally fair procedures throughout proceedings involving the care, custody, and management of the parent's child, the state must prove its case by clear and convincing evidence. As the court stated inSantosky: "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Id., 455 U.S. at 747-48,102 S.Ct. 1388, 71 L.Ed.2d 599.
In evaluating what process is due a natural parent in a permanent custody proceeding, the court must evaluate the following: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and (3) "the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v.Eldridge (1976), 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18.
In the case sub judice, we find no violation of appellant's due process rights. First, we note that the trial court found that SCCS proved its allegations by clear and convincing evidence.
Second, we find no merit to appellant's argument that he was inadequately advised of the allegations surrounding the permanent custody motion. The case was originally filed in 1994. The original complaint contained numerous allegations of appellant's failure to provide the children with a suitable home, including the failure to control alleged sexual activity occurring between the children and other relatives and appellant's failure to discipline his children without resorting to physical violence. The allegations were repeatedly addressed throughout the nearly six year history of the case, through domestic violence counseling, parenting courses, psychological evaluation, and conferences with caseworkers. For appellant to now assert that he had to "guess" about the nature of the problems leading to the children's removal appears disingenuous. Moreover, as appellee notes, appellant never argued during the trial court proceeding that the permanent custody motion failed to provide adequate notice of the conditions that led to the children's removal. See, generally, In re Dukes (1991), 81 Ohio App.3d 145, 610 N.E.2d 513
(stating that a failure to timely object to deficiency in the complaint waives any error).
Additionally, we find no violation of appellant's due process rights as a result of the trial court not appointing a psychiatric expert.[7] In In re Stanley (Dec. 7, 1993), Franklin App. No. 93AP-972, unreported, the court noted as follows with respect to a psychological expert:
 "Where the juvenile court grants the state's request for a psychological examination of an indigent parent to be performed by an examiner selected and paid by the [Children Services Board], the parent is entitled to an expert of his or her own. * * * We agree with the court in In re Angelo Brown [(Nov. 26, 1986), Hamilton App. No. C-850878, unreported] that `the risk of an erroneous determination on the issue of a parent's mental health, when a state agency presents psychiatric evidence which the parent cannot afford to counter, is extremely high, and the value of access to psychiatric expertise to marshal some defense to the agency's evidence is beyond cavil.' Our holding is limited, however, to situations where the court orders an indigent parent to undergo an evaluation by an examiner selected and paid by the non-parent party seeking to destroy parental rights. In essence, the playing field must be level."
We note that the rule "is implicated only when the indigent parent's mental condition is central to the dependency, neglect, or abuse determination and/or forms the basis of the agency's motion for permanent custody." In re Hogle (June 27, 2000), Franklin App. No. 99AP-944, unreported (citing Stanley; In reShaeffer Children (1993), 85 Ohio App.3d 683, 621 N.E.2d 426).
In the case at bar, appellant's mental condition, contrary to his assertions, did not form the basis of SCCS's motion for permanent custody. Although some evidence was presented as to appellant's mental condition, such evidence was not the crux of SCCS's case. Rather, SCCS sought permanent custody due to appellant's failure to control his anger, the children's statements that they are afraid of physical abuse, appellant's failure to protect his children from sexual abuse, appellant's unwillingness to learn non-physical methods of discipline, the unsanitary condition of the residence and the belief that the improved condition of the home is only temporary. Thus, we do not believe that the appointment of a psychological expert in the case sub judice was constitutionally mandated.
Moreover, we note that appellant requested the trial court to order and approve for payment a psychological evaluation.[8] On February 7, 1997, the trial court granted appellant's request, but for reasons not apparent, appellant, prior to the last hearing held February 5, 1999, never received the evaluation. Once the court order was in effect, it became appellant's duty to see that it was enforced. Thus, for this additional reason we again find no error.
Accordingly, based upon the foregoing reasons, we overrule appellant's first and fifth assignments of error.
 II
In his second assignment of error, appellant argues that the trial court's decision granting SCCS permanent custody is against the manifest weight of the evidence. Appellant primarily complains that the trial court failed to consider that he and Sharon currently live in a safe, secure and sanitary environment that is suitable for the children.
We again note that a parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and that a parent has an "essential" and "basic civil right" right to raise his or her children. In re Murray (1990),52 Ohio St.3d 155, 156, 556 N.E.2d 1169, 1171. Once again, however, we further note that the parent's interest and rights are not absolute. A child's best interests may indeed warrant the state in terminating parental rights. See In re Cunningham
(1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034.
R.C. 2151.413[9] permits a public children services agency that has temporary custody of a child to file a motion requesting permanent custody of the child. In considering a motion filed pursuant to R.C. 2151.413, the trial court must follow the guidelines set forth in R.C. 2151.414.
R.C. 2151.414(A)(1) requires the trial court to hold a hearing regarding the motion for permanent custody. The purpose of the hearing is to allow the trial court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1). The adjudication that the child is an abused, neglected, or dependent child may not be re-adjudicated at the hearing. See id. Once a child is adjudicated dependent as defined in R.C. 2151.04, the best interest of the child become the trial court's primary concern when determining whether to grant a permanent custody request.Cunningham, supra.
We note that when reviewing a motion for permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
 (A) To provide for the care, protection, and mental and physical development of children * * *;
* * * *
 (C) To achieve the foregoing purpose, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
R.C. 2151.01. Clear and convincing evidence must exist to support an award of permanent custody. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
 "[The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04,495 N.E.2d 23, 26; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71,74, 564 N.E.2d 54, 60. In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74,564 N.E.2d at 60. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment.Id.
Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id.. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons Coal Co.v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, 1276:
 "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
R.C. 2151.414(B) permits a trial court to grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that the child is not abandoned or orphaned and "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." We note that both the "best interest" determination and the "cannot be placed with either parent" determination focus on the child, not the parent. R.C.2151.414(C) prohibits the trial court from considering the effect the granting of permanent custody to the agency would have upon the parents.
R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether the child cannot or should not be placed with either parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with either parent within or reasonable time or should not be placed with either parent":
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;
 (3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
* * *
 (9) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect;
 (10) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety;
 (11) The parent committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and a sibling of the child previously has been permanently removed from the home of the child's parents because the parent abused or neglected the sibling.
(12) Any other factor the court considers relevant.
A trial court may base its decision that a child cannot be placed with either parent within a reasonable time upon the existence of any one of the above factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time. See In reWilliam S. (1996), 75 Ohio St.3d 95, 661 N.E.2d 738; In re Hurlow
(Sept. 21, 1998), Gallia App. No. 98 CA 6, unreported; In reButcher (Apr. 10, 1991), Athens App. No. 1470, unreported. Once the trial court determines, by clear and convincing evidence, that the child cannot or should not be place with either parent within a reasonable time, the court must decide whether permanent custody would serve the child's best interest.
R.C. 2151.414(D) requires the trial court to consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody. The factors include the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
In the case at bar, we find ample competent, credible evidence to support the trial court's decision to award SCCS permanent custody of Kathy and Patricia.
Substantial competent and credible evidence exists to indicate that the children cannot, or should not, be placed with either parent within a reasonable time. The record reveals that appellant, despite diligent assistance from SCCS, failed continuously and repeatedly to substantially remedy the conditions causing the children's removal. See R.C.2151.414(E)(1). SCCS provided appellant with one-on-one parenting courses and attempted to teach appellant non-physical discipline methods, to no avail. We note that appellant had improved the condition of the home by eliminating some of the problems with the safety and sanitation of the home. SCCS, however, noting that the Harmons have moved several times and, in the past, have demonstrated an inability or unwillingness to maintain a sanitary and safe home, asserted that such improvement was likely to be temporary. Additionally, testimony indicated that certain areas of the home remained unclean.
The above factors also demonstrate that appellant is unwilling to provide an adequate permanent home for the children and is unwilling to prevent the children from suffering physical abuse. See R.C. 2151.414(E)(9). While the foregoing, alone, demonstrates that the children should not or cannot be placed with either parent within a reasonable time, we note that the record demonstrates the existence of other factors.
R.C. 2151.414(E)(11) requires the trial court to find that the child cannot or should not be placed with either parent if clear and convincing evidence exists that the parent committed abuse as defined in R.C. 2151.031 against the child and a sibling of the child previously has been permanently removed from the parent's home because the parent abused the sibling. R.C. 2151.031 defines an abused child an abused child as any child who:
 (A) Is the victim of "sexual activity" as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child.
* * * *
 (D) Because of the acts of his parents * * * suffers physical or mental injury that harms of threatens to harm the child's health or welfare.
We note that a finding that a child is an abused child within the meaning of R.C. 2151.031 does not require a specific finding of parental fault. See In re Pitts (1987), 38 Ohio App.3d 1,525 N.E.2d 814; In re Surfer (Apr. 5, 1998), Franklin App. No. 97APF09-1158, unreported. Rather, a child may be considered an abused child within the meaning of R.C. 2151.031 regardless of who is responsible. Pitts. The focus of the inquiry is on the child's condition and on whether the child is a victim. Id.
In the case at bar, evidence exists that appellant's child from a previous marriage had been removed from the home due to sexual abuse allegations against him. The record further reveals that Kathy had been the victim of sexual abuse and allegations exist that appellant has sexually abused the children. A polygraph examination indicated that appellant was not truthful when he denied the sexual abuse allegation. Additionally, evidence exists that at least one of the children has been the victim of sexual abuse. Moreover, the trial court found that the children would be at high risk of further sexual abuse if permitted to return home.
Evidence also reveals that the children have suffered excessive physical discipline and are afraid of being subjected to further excessive physical discipline if returned home. We believe that the foregoing evidence is sufficient to satisfy R.C.2151.414(E)(11).
We also agree with the trial court's conclusion that granting SCCS permanent custody would serve the children's best interests. With respect to the first factor under R.C. 2151.414(D), the children's interaction and interrelationship with their parents, siblings, and foster care providers, SCCS caseworkers testified that: (1) the children, when they are together, often fight and do not get along; (2) the parents are unable to control the children; (3) the children are afraid of appellant; and (4) both children appear to be thriving in foster care.
The record reveals the following with respect to the second factor, the children's wishes as expressed directly by the child or through the guardian ad litem: (1) Patricia has indicated her desire to return home; (2) Kathy also has indicated a desire to return home, but only if appellant is not present; and (3) the guardian ad litem stated that the children's best interests would be served by granting SCCS permanent custody.
Regarding the third factor, the custodial history of the children, we note that the children have been in and out of the parents' home several times over the course of the last six years and have been in foster care since 1996, where the children have demonstrated improvement.
With respect to the fourth factor, the children's need for a legally secure placement, we agree with the trial court that the children, after being subjected to six years of temporary and protective custody orders with no significant improvement on the parents' part, deserve a stable and nurturing environment and should not have the specter of future custody proceedings constantly in their thoughts.
In light of the foregoing, we conclude that the trial court properly determined that the children should not be placed with either parent and that the children's best interests would be served by awarding SCCS permanent custody.
Within his second assignment of error, appellant also argues that SCCS failed to determine whether the children could be placed with relatives. The record reveals, however, that an interstate study was performed and that the proposed placement was denied.
We also find substantial competent and credible evidence that SCCS made reasonable efforts to avoid removing the children from the home. R.C. 2151.419(A) requires the court to determine whether the agency "has made reasonable efforts to prevent the removal of the child from his home, to eliminate the continued removal of the child from his home, or to make it possible for the child to return home." In addition, R.C. 2151.419(B) requires the trial court to issue written finding of facts setting forth its determination under division (A) of this section. The court must briefly describe the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home. A trial court may conclude that reasonable efforts are not necessary when such efforts would be futile. See,e.g., In re Lawson (Apr. 18, 1997), Clark App. No. 96 CA 10, unreported.
In the case at bar, ample evidence was presented that SCCS made reasonable efforts to prevent the children's continued removal. As the trial court noted, "[t]he testimony is replete with discussion of extraordinary efforts made to help this family." Some of the efforts include the following: (1) psychological evaluations and counseling; (2) domestic violence counseling; (3) rent for Sharon to obtain appropriate housing; (4) transportation when requested; (5) purchase of household goods; and (6) home-based aide services.
We recognize that much of appellant's argument centers around the conflict in testimony as to the condition of the home and as to appellant's denial that he committed any form of sexual abuse against his children. We emphasize, however, that our role as a reviewing court is not to re-weigh the evidence and to re-assess the credibility of witnesses. Rather, as stated in State v. Awan
(1986), 22 Ohio St.3d 120, 123, 489 N.E.2d 277, 280, when conflicts in the evidence arise appellate courts must defer to the trier of fact who had the opportunity to hear witnesses and observe their demeanor:
 "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its judgment for that of the trier of fact."
Although much of the evidence relating to the conditions and environment concerned what had occurred in the past, as we stated in In re Burchfield (1988), 51 Ohio App.3d 148, 156-57,555 N.E.2d 325, 333:
 "`[T]he child does not first have to be put into a particular environment before a court can determine that [the] environment is unhealthy or unsafe. * * * The unfitness of a parent, guardian or custodian can be predicted by past history.'"
(quoting In re Bishop (1987), 36 Ohio App.3d 123, 126,521 N.E.2d 838, 841) (citations omitted). Furthermore, courts have recognized that:
 "` * * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"
Bishop, 36 Ohio App.3d at 126, 521 N.E.2d at 841-42 (quoting Inre East (1972), 32 Ohio Misc. 65, 69, 288 N.E.2d 343, 346).
Given the family's lengthy involvement with children services agencies throughout this state and the parents' continuous failure to provide the children with an adequate, stable and permanent home, we readily agree with the trial court's decision to grant SCCS permanent custody.
Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.
 III
In his third assignment of error, appellant argues that his alleged failure to comply with the case plan should not serve as a basis for terminating his parental rights because the case plan, requiring Sharon to establish a separate residence, violates public policy, is not supported by authority, and is not warranted by sound reason. Appellant argues that the requirement that Sharon establish a separate residence impermissibly interferes with the fundamental right to marry and forces the Harmons to choose between their marriage and their children. We disagree with appellant.
First, we do not believe that the case plan interfered with the Harmons' fundamental right to marry. The case plan did not require the parties to divorce. Rather, the record reveals that SCCS requested Sharon to establish a separate residence to demonstrate her own fitness to raise her children and to allow appellant time to learn to control his anger without resorting to physical abuse.
Second, we note that in a permanent custody proceeding, the question is not "whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal." In reMcKenzie (Oct. 18, 1995), Wayne App. No. 95 CA 0015, unreported; see, also, In re Hogle (June 27, 2000), Franklin App. No. 99AP-944, unreported (stating that "under R.C. 2151.414(E)(1), the relevant inquiry is not simply whether the parents complied with all aspects of the case plan, but whether they complied with the terms and objectives of a case plan related to the conditions causing the child's removal"). See, generally, R.C. 2151.414(C) (stating that "[t]he court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan"). One of the conditions causing the children's removal related to appellant's problems with excessive physical discipline. Neither appellant, nor Sharon through her unwillingness or inability to establish a separate residence, substantially remedied this condition.
Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.
 IV
In his fourth assignment of error, appellant argues that the trial court erred by terminating parental rights when SCCS failed to comply with the ADA by not offering reasonable accommodations to appellant's disabling conditions. Appellant claims that his IQ of 84 and his lack of transportation bring him within the protection of the ADA.
We need not decide whether appellant falls within the protection of the ADA.[10] We do not believe that a failure to comply with the ADA serves as a basis for invalidating an award of permanent custody. Rather, the ADA appears to contemplate a separate procedure for its enforcement. As stated in In reRodriguez:
 "In enacting the ADA * * * Congress * * * articulated the means through which compliance with the ADA is to be obtained. It adopted the remedies and procedures that it had previously selected to enforce compliance with the Rehabilitation Act. * * * The procedure for enforcing the ADA begins with filing a complaint with a designated agency. * * * If appropriate, the agency will refer the case to the Department of Justice, which may file suit in a federal district court. * * * An alternative procedure is for a private individual to directly initiate an action, with or without waiting for the federal administrative procedure to run its course. * * * The action may be in equity, which indicates that there is a possibility of enjoining a public entity from taking action in violation of the ADA. Nevertheless, all the remedies and procedures provided in the ADA legislation contemplate affirmative action on the part of the injured part. Neither Title II of the ADA, or the related regulations, provide that the assertion of a violation of the ADA by a public entity may be used as a defense against a legal action by the public entity."
(Citations omitted.)
Even assuming that the ADA applied to the situation in the case at bar, however, we would find no violation.[11] As the trial court found, SCCS undertook extraordinary efforts to assist appellant in gaining the parental skills he needs to provide a safe and secure home for his children.
Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.
 V
In his sixth assignment of error, appellant argues that the trial court erred by failing to hold a hearing regarding sanctions for contempt. We find no merit to appellant's argument.
Pursuant to Juv.R. 24(C), the trial court can impose sanctions for failure to comply with discovery orders. Juv.R. 24(C) states:
 If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an order issued pursuant to this rule, the court may grant a continuance, prohibit the person from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances.
The record reveals that appellant filed a motion for contempt due to SCCS's alleged failure to provide proper discovery. On October 22, 1998, the trial court inquired into the status of the parties' discussions related to the discovery forming the basis of the contempt motion. Appellant's attorney indicated that he was seeking sanctions and agreed that as of October 22, 1998, the discovery sought had been provided. The trial court then advised appellant's attorney that it was not prepared to issue any findings regarding the contempt motion, but wished first to conclude the permanent custody hearing. The court informed appellant's attorney that it would hold a hearing on the issue, if appellant requested a hearing. The court further advised appellant's attorney to submit an entry "setting the issues * * * raised by the motion to cite for contempt for a later hearing." Appellant never submitted such an entry.
Because appellant never submitted an entry, we believe that appellant has waived the right to argue on appeal error on the trial court's part. See, generally, State v. White (Aug. 21, 1996), Lorain App. 95 CA 6290, unreported. Moreover, we agree with appellee that any error with the failure to hold a hearing for sanctions would not require an outright reversal of the trial court's decision granting appellee permanent custody. See, generally, In re Freedom (Oct. 2, 1989), Marion App. Nos. 9-88-38 and 9-88-41.
Accordingly, based upon the foregoing reasons, we overrule appellant's sixth assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate procedure.
Harsha, J. Kline, P.J.: Concur in Judgment Opinion
_______________________ Peter B. Abele, Judge
[1] On November 18, 1994, the Harmons filed a notice of change of address with the court.
[2] In June of 1999, David died from complications of muscular dystrophy. Thus, the majority of our discussion in this opinion concerns Kathy and Patricia.
[3] The evidence indicates that David "confessed" to having sex with his two sisters. See Father's exhibit 16.
[4] We note that appellant stipulated to admission into evidence of the polygraph examination results.
[5] We note that the filthy condition of the home was one of the reasons ACCS requested the removal of the Harmon children.
[6] We note that different spellings of Lewis' name appear in the record. We use the spelling as it appears in the transcript.
[7] The state notes that appellant requested a psychological, not a psychiatric, evaluation. We see no substantive distinction between the two fields for purposes of ruling upon the present assignment of error.
[8] On February 7, 1997, the trial court ordered appellant to obtain a psychological evaluation. On June 5, 1997, appellant filed a motion to continue the hearing set for June 6, 1997. Appellant requested additional time to seek an appropriate psychological evaluation. The trial court denied appellant's request for a continuance, noting that appellant had ample time to have had a psychological evaluation performed. On June 10, 1997, appellant requested the trial court to enforce its prior order relating to the psychological evaluations.
[9] We note that since the original complaint was filed in Allen County in 1994, the Ohio General Assembly has amended, several times, many provisions contained within R.C. Chapter 2151. The most recent amendments became effective July 1, 2000. The statutes cited in this opinion refer to the statutes as it existed at the time of the complaint seeking permanent custody, October 9, 1996.
[10] In In re Burrows (May 30, 1996), Athens App. No. 95 CA 1698, unreported, we assumed, for the sake of argument, that the ADA applied to a permanent custody proceedings. We also noted that courts have expressed varying views as to whether the ADA applies to permanent custody proceedings.
[11] We question whether a low IQ entitles one to the protection of the ADA.